# EXHIBIT E

## DECLARATION OF BRICKZAIDA APONTE

I, BRICKZAIDA APONTE hereby declare the following under penalty of perjury to support Plaintiff King's motion for class certification:

1.      I was hired by Defendant WILDCAT SERVICE CORPORATION from in or around May 2018 as a Maintenance Worker and Laborer and was then sent to work at third party companies under Defendant's job placement program. My employment was terminated on or around January 6, 2019.

2.      At all times I was an employee of FEDCAP REHABILITATION SERVICES, INC. and WILDCAT SERVICE CORPORATION (the "Corporate Defendants"). From my experience, I understand that FEDCAP REHABILITATION SERVICES, INC. and WILDCAT SERVICE CORPORATION jointly operate a job recruiting and placement company in New York City. The paystubs I have reveal that my employer was both FEDCAP REHABILITATION SERVICES, INC. and WILDCAT SERVICE CORPORATION.

3.      My primary work location was the Atlantic Armory Shelter located at 1322 Bedford Avenue, Brooklyn, NY 11216 ("main location"). In addition to the "main location", I was also required to work at Path DHS Shelter located at 151 East 151st Street, Bronx, NY 10451, Kingsborough Star Men's Shelter located at 599 Clarkson Avenue, Brooklyn, NY 11203, Catherine Street Family Respite Shelter located at 78 Catherine Slip, New York, NY 10038, and Flatlands Family Residence located at 108-75 Avenue D, Brooklyn, NY 11236 (collectively "the other locations").

4.      Throughout my employment with Defendants, I regularly spoke with my fellow non-managerial co-workers regarding our wages. Such co-workers include, but are not limited to:

| Name | Position |
|------|----------|
| "Pinky" | Maintenance |

1

| April [LNU] | Maintenance |
| Maria [LNU] | Maintenance |

Based on my work experience and my personal observations and conversations with co-workers, I know that all employees of Defendants were subject to the same wage and hour policies. I regularly spoke with my co-workers at all locations during breaks or during travel time, and it was common knowledge that Defendants engaged in the practices described below. My co-workers also were required to work at multiple locations.

5.      Throughout my employment with Defendants, I was regularly scheduled to work five (5) days per week, from 8:00 AM to 4:00 PM at the "main location". I also regularly worked at the "other locations" from 4:00 PM to 12:00 AM or from 6:00 PM to 2:00 AM.  As a result, I was regularly required to work a total of approximately eighty (80) hours a week. In addition to my regular schedule, I was also required to work every other weekend (Saturdays and Sundays) from 8:00 AM to 12:00 AM for a total of roughly a hundred (100) hours per week every alternate week. Based on my personal observations and conversations, other employees employed by Defendants' (including, but not limited to, individuals listed in ¶ 4 herein) also worked the same or similar hour.

6.      Throughout my employment with Defendants, I was paid on an hourly basis by check every two (2) weeks. Based on my personal observations, other employees employed by Defendants' (including, but not limited to, individuals listed in ¶ 4 herein) similarly compensated on an hourly basis, by checks, every two (2) weeks.

7.      Throughout my employment, my work engaged in physical labor, including but not limited to tasks such as sweeping, waxing, taking out trash, and moving furniture. Based on my

personal observations and conversations with co-workers, other employees (including, but not limited to, individuals listed in ¶ 4 herein) were similarly required to engage in physical labor.

8.      Throughout my employment with Defendants, Defendants had a policy of deducting thirty (30) minutes for a break during every scheduled shift. However, I was not able to take a free and clear meal break and had to work through my breaks instead. Based on my personal observations and conversations with co-workers, other employees (including, but not limited to, individuals listed in ¶ 4 herein) were similarly time shaved.

9.      Additionally, when I was required to travel from the "main location" to the "other locations" to continue working, Defendants did not pay me for the travel time. Based on my personal observations and conversations with co-workers, other employees (including, but not limited to, individuals listed in ¶ 4 herein) similarly were required to travel to "other locations" and were not paid.

10.     I frequently discussed Defendants' illegal time shaving policies with other employees, particularly "Pinky," April [LNU], and Maria [LNU] while we were working or during travel time to other locations. We would discuss how the hours reported on our pay stubs did not reflect the actual hours we worked. "Pinky," April [LNU], and Maria [LNU] complained that they often had to work past their scheduled shifts and confirmed that their pay stubs included only their scheduled shifts and did not include all the hours that they were required to work. "Pinky," April [LNU], and Maria [LNU] also complained about not enjoy their meals in peace, and that Defendants took advantage of them by requiring them to work through their meal breaks so that we could not enjoy free and clear meal breaks.

11.     "Pinky," April [LNU], and Maria [LNU] and I would be sent to the same "other location" to continue working after our shift at the "main location." We were never paid for any

travel time. I recall that, while travelling, we would discuss how absurd it was that we were not paid for the time spent travelling to the "other locations" despite Defendants requiring us to travel.

12.     Throughout my employment with Defendants, Defendants improperly rounded down my weekly hours worked and then paid wages only for those rounded hours instead of the actual hours worked. This rounding policy resulted, over a period of time, in a weekly failure to compensate me the proper wages for all hours worked. Based on my personal observations and conversations with co-workers, the hours of all other employees (including, but not limited to, individuals listed in ¶ 4 herein) were similarly rounded.

13.     I frequently discussed Defendants' illegal rounding policies with other employees. I recall that "Pinky," April [LNU], and Maria [LNU] complained to me that that their hours were also rounded down on a weekly basis and they complained specifically that the paid hours always ended in .00 or .50 and was fewer hours than what they actually worked. All of our paystubs showed rounding that showed that we were paid for rounded hours and failed to show and compensate us for all the hours we actually worked.

14.     Throughout my employment with Defendants, Defendants regularly failed to pay my wages within seven (7) days of the end of the week in which I earned them. Defendants would provide me with checks every two (2) weeks. Based on my personal observations and conversations with co-workers, other employees (including, but not limited to, individuals listed in ¶ 4 herein) were similarly paid every two (2) weeks instead of within seven (7) days of the end of the week in which they earned them.

15.     I discussed Defendant's late payment of wages policy with other employees. I specifically recall that, while talking with "Pinky," April [LNU], and Maria [LNU] they confirmed that they were also improperly paid on a bi-weekly basis, instead of on a weekly basis.

16.     Throughout my employment with Defendants, I regularly worked shifts exceeding ten (10) hours in duration, however, Defendants failed to provide me with my spread of hours premium for those shifts. Based on my personal observations and conversations with co-workers, other employees (including, but not limited to, individuals listed in ¶ 4 herein) were similarly not paid spread of hours premium when working shifts exceeding ten (10) hours in duration.

17.     At all times, "Pinky," April [LNU], and Maria [LNU] and I did not complain to our supervisors because we did not want to lose our jobs. I recall observing someone complain once and that person's hours were reduced, and they were treated differently by management. After witnessing the results of Defendants' retaliation, we were too concerned about our job stability to openly complain to Defendants.

18.     When I was hired by Defendants, I did not receive a wage and hour notice as required under New York Labor Law. Based on my personal observations and conversations, no other employee (including, but not limited to, individuals listed in ¶ 5 herein) ever received a written wage and hour notice at the time of hiring or thereafter, informing them of their rates of pay or other requirements under the New York Labor Law.

19.     During my employment with Defendants, I received wage statements from Defendants but they failed to state the correct number of hours that I worked each week, due to Defendants' improper rounding and time shaving policies, including failure to pay for travel time. Based on my personal observations and conversations with my co-workers, other employees (including, but not limited to, individuals listed in ¶ 5 herein) received similar improper proper wage statements.

20.     Throughout my employment with Defendants, Defendants permitted managerial employees to foster a hostile work environment on the basis of gender. The supervisors at the

Atlantic Armory Shelter location created a hostile environment and discriminated against me on the basis of gender. Supervisors Dean Rivera and "James" would constantly hurl gender-based insults at me, such as, "Stupid bitch," "You don't have the balls for this job," "You're a woman, and this is a man's job," and an assortment of other gender based derogatory comments.

21.    I do not want to settle on individual basis and intend to proceed with a collective and class lawsuit and resolution. The Defendants are large companies with hundreds of employees in NYC who are Manual Laborers and Maintenance Workers like myself. I myself worked with over fifty (50) individuals during my time at Defendants business.

[REST OF PAGE LEFT INTENTIONALLY BLANK]

I affirm, under penalty of perjury, that the above and foregoing information is true and correct.

Dated: _7/20/21_

_____

Brickzaida Aponte

Sworn to before me
this 20th day of July, 2021

Anne Seelig-Suhrcke
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02SE6113610
Qualified in Queens County
Commission Expires 8/02/2024