# Exhibit D

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HAROLD KING,
*on behalf of himself, FLSA Collective Plaintiffs and the Class,*

                Plaintiff,

                v.

FEDCAP REHABILITATION SERVICES, INC.,
and WILDCAT SERVICE CORPORATION,

                Defendants.

Case No.: 20-cv-01784

---

## DECLARATION OF HAROLD KING

I, HAROLD KING, under penalty of perjury, affirm as follows:

1. In or around January 2014, I was hired by Defendants FEDCAP REHABILITATION SERVICES, INC. and WILDCAT SERVICE CORPORATION ("Defendants") as a laborer and maintenance worker to do work for third-party companies that contract for services with Defendants. I was terminated in or around May 2019.

2. Throughout my employment, I spent all of my time engaged in physical labor, including but not limited to tasks such as driving, operating industrial equipment, fixing, plumbing, and cleaning buildings. Based on my personal observations and conversations with co-workers, other employees (including but not limited to individuals listed in ¶ 10 herein) were also engaged in physical labor.

1

DocuSign Envelope ID: EDE7A92F-34A3-4ACC-B770-51B4A3C555F3

Case 1:20-cv-01784-VSB-SDA   Document 77-4   Filed 10/08/21   Page 3 of 7

3. Throughout my employment with Defendants, I was paid on an hourly basis by check. Based on my personal observations, other employees were similarly compensated on an hourly basis by check.

4. Throughout my employment with Defendants, I was assigned to work at the Governors Island location, located at Governors Island, New York, NY 11231, where I would, among other things, remove asbestos and install portable toilets. But, sometimes, I and other workers were also required to work at other locations, such as homeless shelters, during a second evening shift. However, employees who traveled to a second work location during a workday were not paid for such travel time.

5. Throughout my employment with Defendants, I was usually scheduled to work six (6) days per week from 7:00 AM to 3:00 PM. However, my co-workers and I (including but not limited those listed in ¶ 10 herein) were frequently required to stay past our shift until around 4:30 without being paid for this additional time. Our supervisors would attempt to justify this using a variety of pretexts. For example, the only way off Governors' Island was through a ferry, so it normally was not possible to leave right when our shifts were supposed to end, since we had to wait for the ferry. This made it easy for our supervisors to demand that we stay on working for a while, since we would have nothing to do except wait for the ferry. So, our supervisors would assign us some task that they said wouldn't take very long. But one task led to another, and we would find ourselves working until around 4:30, even though a ferry was available before then. Regardless of the reasons given by our supervisors and regardless of how long we actually worked, my co-workers and I would be paid only for our scheduled hours minus a one-hour meal break.

6. We could not actually take this meal break, however. Throughout my employment with Defendants, Defendants had a policy of deducting an hour for a meal break during every

scheduled shift. However, my co-workers and I (including but not limited those listed in ¶ 10 herein) were still required to perform work during what was supposed to be our meal break. Our supervisors would often tell us not to worry about this, since we could just leave early to make up for it. But this never happened. On the contrary, we would end up leaving well after our scheduled shifts, as discussed above, so our hours were not accurately recorded or compensated. As the end of our shifts approached, supervisors would direct us to begin and complete another task that they knew would occupy us until after the end of our scheduled shifts, telling us that it was very important that it be finished that day or that leaving it for the next day would be highly inefficient.

7. My co-workers and I did not have an opportunity to record the actual times we began and ended working. While we had time sheets that supposedly tracked our time, these were always filled in by our supervisors, not by us. So, we could either initial our name on the inaccurate statements and get paid something or else refuse and get paid nothing. It was a take-it-or-leave-it proposition. This is why my wage statements list my hours in whole numbers—because our pre-filled time sheets always ended in whole hours. In fact, employees almost never left exactly on the hour or half-hour. Based on my personal observations and conversations with co-workers, other employees of Defendants (including, but not limited to, individuals listed in ¶ 10 herein) also had to sign pre-filled time sheets and were time-shaved as a result.

8. When I was hired by Defendants, I did not receive a wage and hour notice. Based on my personal observations and conversations, no other employee (including, but not limited to, individuals listed in ¶ 10 herein) ever received a written wage and hour notice, at the time of hiring or thereafter, informing them of their rates of pay.

9. During my employment with Defendants, I received wage statements from Defendants but these failed to state the correct number of hours that I worked each week, due to

3

the time shaving I have described. Based on my personal observations and conversations with my co-workers, other employees (including, but not limited to, individuals listed in ¶ 10 herein) received similar improper wage statements.

10. Throughout my employment with Defendants, I regularly spoke with my fellow non-managerial coworkers regarding our wages. Such co-workers include, but are not limited to:

| Name | Position |
| --- | --- |
| Malik [LNU] | Laborer |
| Abu [LNU] | Laborer |
| Abby [LNU] | Laborer |

Based on my work experience and my personal observations and conversations with co-workers, I know that all employees of Defendants were subject to the same wage and hour policies. I regularly spoke with my co-workers, and it was common knowledge that Defendants engaged in the practices described below. We would complain to each other during our working hours when supervisors weren't around or if we left work together.

11. I frequently discussed Defendants' illegal rounding and time shaving policies with other employees, particularly Malik [LNU], Abu [LNU], and Abby [LNU], while we were working. We would complain to each other about how we were being shortchanged by Defendants' time shaving. Malik [LNU], Abu [LNU], and Abby [LNU] often complained to me about having to work past their scheduled shifts and through their lunch breaks and how this was not reflected in their paystubs, which was based on scheduled shifts minus an automatic deduction for fake meal breaks. However, they did not complain to supervisors about this for the same reason I didn't, fear of losing their jobs.

12. I agree to act as a class and collective representative and am of sound mind and body.

13. I do not have any conflicts with prospective class and collective members.

14. I do not want to settle on individual basis and intend to proceed with a collective and class lawsuit and resolution. The Defendants are large companies with hundreds of employees in NYC who are manual laborers and maintenance workers like myself. I myself worked with over fifty (50) different individuals during my time at Defendants business.

[REST OF PAGE LEFT INTENTIONALLY BLANK]

I affirm, under penalty of perjury, that the foregoing statements are true and correct.

Dated: 10/8/2021

*Harold King* (DocuSigned)

Harold King